United States Courts
Southern District of Texas
FILED

December 23, 2020

David J. Bradley, Clerk of Court

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 for the 𝔉𝔦𝔣𝔱𝔥 𝔠𝔦𝔯𝔠𝔲𝔦𝔱

United States Court of Appeals
Fifth Circuit

**FILED**

December 21, 2020

Lyle W. Cayce
Clerk

No. 19-20023

---

MICHAEL J. HEWITT,

*Plaintiff—Appellant*,

*versus*

HELIX ENERGY SOLUTIONS GROUP, INCORPORATED; HELIX WELL OPS, INCORPORATED,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:17-CV-02545

---

Before WIENER, HIGGINSON, and HO, *Circuit Judges*.

JAMES C. HO, *Circuit Judge*:

Our prior opinion in this case is withdrawn, and the following is substituted in its place. The petition for rehearing en banc remains pending.

\* \* \*

The Fair Labor Standards Act establishes a standard 40-hour work week by requiring employers to pay a 50 percent overtime penalty for any time worked over 40 hours per week. *See* 29 U.S.C. § 207(a). Many people do not think of overtime pay as a penalty on the employer, but as a benefit to

No. 19-20023

the employee. But that is not the only way—and perhaps not even the proper way—to understand the Act. Historically, the FLSA has been understood to "reduce unemployment," as well as to protect workers from excessive hours, by encouraging employers to hire two workers to work 40 hours rather than one worker to work 80 hours. Hence the use of the term "penalty." *See, e.g.*, *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1176 (7th Cir. 1987) (Posner, J.) (explaining that Congress enacted the FLSA in part "to spread work and thereby reduce unemployment, by requiring an employer to pay a penalty for using fewer workers to do the same amount of work as would be necessary if each worker worked a shorter week"). *See also Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 577 (1942) ("[O]ne of the fundamental purposes of the Act was to induce worksharing and relieve unemployment by reducing hours of work.") (quotations omitted).

These principles apply, of course, only to those workers who are in fact covered by the Act. Congress exempted "bona fide executive, administrative, [and] professional" employees from the overtime laws. 29 U.S.C. § 213(a)(1). And it expressly authorized the Secretary of Labor to promulgate regulations to further "define[] and delimit[]" those terms. *Id.*

This case involves a worker who is purportedly an "executive" employee under the regulations—and a "highly compensated" one at that, earning over $200,000 per year. *See* 29 C.F.R. § 541.100 (executive employees); *id.* § 541.601 (highly compensated employees). But the precedent we establish here will equally govern lower paid "administrative" and other employees as well, who receive "not less than $684 per week," or $35,568 per year. *See id.* § 541.200 (administrative employees).

That is because this appeal turns on a legal question common to all executive, administrative, and professional employees—and to the modestly and highly compensated alike: whether a worker is paid "on a salary basis"

2

No. 19-20023

under § 541.602.  *See id.* § 541.100(a)(1); *id.* § 541.200(a)(1); *id.* § 541.300(a)(1); *id.* § 541.601(b)(1). (The regulations also exempt employees paid on a "fee basis," but that is not an issue in this appeal.)

Helix Energy Solutions Group paid Michael Hewitt a daily rate. Under the regulations, an employee whose pay is computed on a daily basis—rather than on a weekly, monthly, or annual basis—could in theory be regarded as paid on a "salary basis" under § 541.602. But the regulations are explicit that special rules apply when it comes to daily rate workers:

> An exempt employee's earnings *may be computed on* an hourly, *a daily* or a shift *basis, without losing the exemption or violating the salary basis requirement, if* the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, *and* a reasonable relationship exists between the guaranteed amount and the amount actually earned.

*Id.* § 541.604(b) (emphasis added).

So a daily rate worker can be exempt from overtime—but only "if" two conditions are met: the minimum weekly guarantee condition and the reasonable relationship condition. The employer here does not even purport to meet both of these conditions. Instead, the employer candidly asks us to ignore those conditions.

But "if" means "if"—not "irrespective of." And respect for text forbids us from ignoring text. Respect for text thus requires us to hold that Helix is subject to the requirements of § 541.604(b). We accordingly reverse and remand for further proceedings.

## I.

Hewitt worked as a tool pusher for Helix for over two years. In that position, Hewitt managed other employees while on a "hitch"—that is,

No. 19-20023

while working offshore on an oil rig.  Each hitch lasted about a month.  According to the summary judgment record, Helix paid Hewitt based solely on a daily rate.

Helix concedes that it required Hewitt to work over forty hours per week.  Helix nevertheless attempts to avoid the FLSA overtime penalty by characterizing Hewitt as either an executive or highly compensated employee—both of which are exempt from the FLSA overtime requirements.  *See id.* § 541.100 (executive employees); *id.* § 541.601 (highly compensated employees).[1]

To prevail under either formulation, Helix must show that it paid Hewitt on a "salary basis" as defined by the regulations.  *Id.* §§ 541.100(a)(1), .600(a), .601(b)(1).  (Alternatively, Helix could attempt to invoke the highly compensated employee exemption by showing that it paid Hewitt on a "fee basis"—but it has made no such argument in this appeal.  *See id.* §§ 541.601(b)(1), .605.)

Hewitt contends that Helix did not pay him on a "salary basis" because the company calculated his pay using a daily rate but did not satisfy the requirements of § 541.604(b).  Helix responds that it was not required to comply with § 541.604(b).

The district court agreed with Helix and granted the company summary judgment.  *Hewitt v. Helix Energy Sols. Grp.*, 2018 WL 6725267, at *3–*4 (S.D. Tex. Dec. 21, 2018).  This appeal followed.  We review the

---

[1] We note that "highly compensated employees" are simply a subset of exempt executive, administrative, or professional employees.  *See, e.g., Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1042 n.2 (8th Cir. 2020) ("Although the parties and the district court refer to a 'highly compensated employee exemption,' this is a less burdensome way to prove an executive, administrative, or professional exemption, not a separate exemption."); *see generally* 29 C.F.R. § 541.601(c).

No. 19-20023

district court's interpretation of the applicable Labor Department regulations de novo. *See Davis v. Signal Int'l Texas GP, L.L.C.*, 728 F.3d 482, 488 (5th Cir. 2013).

## II.

There are multiple components to the salary basis test, as articulated in various Labor Department regulations.  There is the "[g]eneral rule"—and then there are various exceptions and provisos to that general rule.  To properly understand and apply the salary basis test, we must examine not only the general rule, but also any exceptions or provisos that bear upon a particular fact pattern—such as the daily rate issue presented in this appeal.

## A.

The "[g]eneral rule" begins as follows:  "An employee will be considered to be paid on a 'salary basis' within the meaning of this part if the employee regularly receives each pay period *on a weekly, or less frequent basis*, a predetermined amount constituting all or part of the employee's compensation." 29 C.F.R. § 541.602(a) (emphasis added).  The general rule further provides that "an exempt employee must receive the full salary for any week in which the employee performs any work *without regard to the number of days or hours worked*." *Id.* § 541.602(a)(1) (emphasis added).

The emphasis on being paid "on a weekly, or less frequent basis"—and "without regard to the number of days or hours worked"—begs the question:  What if an employee's compensation is computed on a *daily* basis—rather than on a weekly, monthly, or annual basis?  In other words, what if the employee is *not* paid "on a weekly, or less frequent basis," but instead *with* "regard to the number of days or hours worked"?

In sum:  Can a daily rate employee ever be regarded as being paid on a "salary basis" and therefore exempt from overtime pay under the FLSA?

5

No. 19-20023

To answer that question, we must look beyond the "[g]eneral rule," and turn instead to one of the provisos promulgated by the Secretary. And as it turns out, the answer is yes—a daily rate employee *can* qualify under the salary basis test—but only "if" certain other conditions are met.

The Sixth and Eighth Circuits have so held. And we agree: "The text of § 541.602(a) does not tell us what to do when an employee's salary is *not* clearly calculated 'on a weekly, or less frequent basis.'" *Hughes v. Gulf Interstate Field Servs. Inc.*, 878 F.3d 183, 189 (6th Cir. 2017). Instead, we must turn to a "helpful" "neighboring provision"—namely, § 541.604(b). *Id.* Similarly, the Eighth Circuit concluded that the "general definition" of salary basis as set forth in § 541.602(a) is "subject to numerous interpretive rules." *Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1042 (8th Cir. 2020). And the first example that circuit gave was § 541.604(b). *See id.* (quoting § 541.604(b)); *see also id.* at 1048 (relying on *Hughes* and § 541.604(b)).

So we turn to § 541.604(b). That regulation makes clear that an employer *can* pay an exempt employee an amount "computed on . . . a daily . . . basis, without losing the exemption or violating the salary basis requirement." 29 C.F.R. § 541.604(b). But that is so only "if" two conditions are met. *Id.* Those conditions are as follows: First, "the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked." *Id.* Second, "a reasonable relationship exists between the guaranteed amount and the amount actually earned." *Id.*

This two-prong test protects employees in two ways. First, the "minimum weekly" guarantee ensures that a daily rate employee still receives a guaranteed amount each week "regardless of the number of hours, days or shifts worked." *Id.* In other words, it sets a *floor* for how much the

No. 19-20023

employee can expect to earn, "regardless" of how many hours, days, or shifts the employee works. *Id.* Second, the reasonable relationship test ensures that the minimum weekly guarantee is not a charade—it sets a *ceiling* on how much the employee can expect to work in exchange for his normal paycheck, by preventing the employer from purporting to pay a stable weekly amount without regard to hours worked, while in reality routinely overworking the employee far in excess of the time the weekly guarantee contemplates. And as the Labor Department has explained, without the reasonable relationship test, "employees could routinely receive weekly pay of $1,500 or more and yet be guaranteed only the minimum required $455 (thus effectively allowing the employer to dock the employee for partial day absences)." DEP'T OF LABOR, DEFINING AND DELIMITING THE EXEMPTIONS FOR EXECUTIVE, ADMINISTRATIVE, PROFESSIONAL, OUTSIDE SALES AND COMPUTER EMPLOYEES; FINAL RULE, 69 FED. REG. 22,121, 22,184 (2004). But "[s]uch a pay system would be inconsistent with the salary basis concept and *the salary guarantee would be nothing more than an illusion.*" *Id.* (emphasis added). *See also Brock v. Claridge Hotel & Casino*, 846 F.2d 180, 185 (3rd Cir. 1988) (explaining that an employee is not paid on a "salary basis" if "the employee's usual weekly income" calculated on an hourly basis "far exceeds the 'salary' guarantee" the employer provided).

So an employer can pay a daily rate under § 541.604(b) and still satisfy the salary basis test of § 541.602—but only if the employer complies with both the minimum weekly guarantee requirement and the reasonable relationship test.

Helix does not comply with either prong. First, it pays Hewitt a daily rate without offering a minimum weekly required amount that is paid "regardless of the number of hours, days or shifts worked." 29 C.F.R. § 541.604(b). Rather, Helix theorizes that the daily rate that it pays Hewitt *is* a minimum weekly guaranteed amount—even though it is the very

7

No. 19-20023

opposite of an amount that is paid "regardless of the number of . . . days . . . worked." *Id.* Second, Helix does not comply with the reasonable relationship test. To the contrary, it pays Hewitt orders of magnitude greater than the minimum weekly guaranteed amount theorized by Helix—namely, Hewitt's daily rate. Not surprisingly, Helix does not even bother to contend that it satisfies the reasonable relationship test.

Instead, Helix contends that it is not required to comply with § 541.604(b), because Hewitt is a "highly compensated employee" under § 541.601. In other words, in Helix's view, if an employee satisfies § 541.601, there is no need to additionally satisfy § 541.604(b).

But the text of § 541.601 says precisely the opposite. It makes clear that it's not enough that the employee receives a "total annual compensation of at least $107,432." *Id.* § 541.601(a)(1). It *also* requires that that "'[t]otal annual compensation' *must include* at least $684 per week *paid on a salary . . . basis.*" *Id.* § 541.601(b)(1) (emphases added). So Hewitt cannot be a "highly compensated employee" under § 541.601 unless his total annual compensation satisfies the salary basis test. And as we've already explained, the only way for an employee paid on a daily rate to satisfy the salary basis test is to comply with the two conditions of § 541.604(b).

Moreover, the same "salary basis" language that appears in the highly compensated employee regulation also appears in the regulations governing *all* executive, administrative, and professional employees—including employees who make far less than $107,432 per year. *Id.* § 541.601(a)(1). Like their "highly compensated" counterparts, all other executive, administrative, and professional employees are exempt if they are "[c]ompensated on a salary basis." *Id.* § 541.100(a)(1). *See also id.* § 541.200(a)(1) (same); *id.* § 541.300(a)(1) (same). And that is so even though they receive much less compensation—"not less than $684 per

No. 19-20023

week," or $35,568 per year. *Id.* § 541.100(a)(1); § 541.200(a)(1) (same); *id.* § 541.300(a)(1) (same). We can find no textual or other principled basis for exempting highly compensated employees, but not all other executive, administrative, and professional employees, from § 541.604(b).

## B.

Our reading of the regulations finds support not only from the Sixth and Eighth Circuits, but also in repeated statements by the Labor Department. Those statements confirm that a daily rate employee falls outside the general rule, and thus must qualify under some other exception or proviso such as § 541.604(b).

For example, when the Department promulgated § 541.604(b) in 2004, it explained that the "[p]roposed section 541.604(b) provided that an exempt employee's salary may be computed on an hourly, daily or shift basis, if the employee is given a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, and 'a reasonable relationship exists between the guaranteed amount and the amount actually earned.'" DEFINING AND DELIMITING THE EXEMPTIONS, 69 FED. REG. at 22,183. "[T]he reasonable relationship requirement applies . . . when an employee's actual pay is computed on an hourly, daily or shift basis." *Id.*

And just this year, the Labor Department reaffirmed this point within the specific context of "highly compensated employees" who are "paid a day rate." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2020-13, 2020 WL 5367070, at *1 (Aug. 31, 2020). In an opinion letter, the Administrator of the Wage and Hour Division agreed with our previous ruling in this case, noting that "[t]he Fifth Circuit recently addressed a similar question, holding that an employee paid a daily rate, *with no minimum weekly guarantee*, is not paid on a salary basis" under "the plain language of

the salary basis test." *Id.* at *4 (emphasis added) (citing *Hewitt v. Helix Energy Sols. Grp.*, 956 F.3d 341, 342–43 (5th Cir. 2020)). "The *Hewitt* plaintiff, like the employees here, was paid per day of work." *Id.* "[S]o he was paid '*with*' (not 'without') 'regard to the number of days or hours worked,' in direct conflict with the plain language of the salary basis test." *Id.* (some quotations omitted).

Moreover, the Administrator further explained that this "conclusion is further supported by [the Department] having specified certain instances when exempt executive, administrative, or professional employees may be paid a daily rate while not more generally permitting a day rate to satisfy the salary basis test." *Id.* at *4 n.27 (noting as an example 29 C.F.R. § 541.709, which exempts certain motion-picture employees from complying with the salary basis test at all). So the Department "knows how to include in the exemption certain employees whose pay is calculated on a daily basis; it has chosen not to do so broadly." *Id.* "The familiar 'easy-to-say-so-if-that-is-what-was-meant' rule of interpretation has full force here." *Id.* (cleaned up) (quoting *C.I.R. v. Beck's Estate*, 129 F.2d 243, 244 (2nd Cir. 1942)). And that same logic of course applies to other daily rate provisions like § 541.604(b). We see no reason not to agree with the respected Administrator.

## C.

Helix contends that our understanding of the salary basis test conflicts with *Litz v. Saint Consulting Group, Inc.*, 772 F.3d 1 (1st Cir. 2014), and *Anani v. CVS RX Services, Inc.*, 730 F.3d 146 (2nd Cir. 2013). To be sure, there is some language in *Anani* that appears to be in tension with the approach taken here. *See Anani*, 730 F.3d at 149 ("We perceive no cogent reason why the requirements of C.F.R. § 541.604 must be met by an employee meeting the requirements of C.F.R. § 541.601."); *see also Litz*, 772 F.3d at 5 (quoting *Anani* but noting that "[p]laintiffs 'do not take a position on this issue'").

No. 19-20023

But on closer analysis, we see no actual conflict here. Unlike Hewitt, the employees in *Litz* and *Anani* were paid a weekly guaranteed salary "regardless of the number of hours, days or shifts worked." 29 C.F.R. § 541.604(b). *See Litz*, 772 F.3d at 2 (employees were "guaranteed a minimum weekly salary of $1,000 *whether they bill[ed] any hours or not*") (emphasis added); *Anani*, 730 F.3d at 148 (employee's "base weekly salary was guaranteed, i.e. to be paid *regardless of the number of hours . . . actually worked*") (emphasis added). In other words, *Litz* and *Anani* were in fact weekly rate cases. So those cases have nothing to say about Hewitt, who was paid solely based on a daily rate.

Indeed, the Sixth Circuit has made precisely this observation already. As that court explained, "the situations in which [*Litz* and *Anani*] ignore § 541.604(b) are situations in which the textual requirements of 29 C.F.R. §§ 541.601, 541.602(a) are already clearly met." *Hughes*, 878 F.3d at 189. In other words, "*Anani* and *Litz* involved plaintiffs who . . . were undisputedly guaranteed weekly base salaries above the qualifying level." *Id.* at 189–90. We agree with the Sixth Circuit: There is no split.[2]

## D.

Amici offer two additional points in hopes of bolstering Helix's position.

---

[2] Moreover, if there is a split, it's one that has existed since 2017, when the Sixth Circuit decided *Hughes*. What's more, it seems telling that, since *Hughes*, no circuit has seen fit to join the First and Second Circuits in this alleged split. Quite the opposite, in fact: Just this year, both the Eighth Circuit and the Labor Department sided with the Sixth Circuit (and with our circuit) over *Litz* and *Anani*. *See Coates*, 961 F.3d at 1048 (relying on *Hughes* and § 541.604(b)); Opinion Letter FLSA2020-13, 2020 WL 5367070 (relying on *Hewitt*). Even the dissent acknowledges as much. *Post*, at 31–32 (noting *Hughes* and *Coates*); *id.* at 32–33 (noting Opinion Letter FLSA2020-13).

No. 19-20023

First, amici suggest that, because Hewitt was already well compensated, extending overtime protection to him conflicts with the purpose of the FLSA.

But that is wrong as a matter of both text and purpose. To begin with, it should go without saying that we are governed by the text of the regulation, not some unenumerated purpose. *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). If the Secretary had wanted to exempt employees based solely on the fact that they are well compensated, the regulations could have been written accordingly. In fact, as the Labor Department has publicly noted, "a number of commenters" have "urge[d] the Department to abandon the salary basis test entirely, arguing that [the] requirement serves as a barrier to the appropriate classification of exempt employees." DEFINING AND DELIMITING THE EXEMPTIONS, 69 FED. REG. at 22,176. But the Secretary has so far rejected those requests, and instead required *both* that the employee be paid at least a certain amount of compensation *and* that the compensation be paid "on a salary basis." *See id.* ("[T]he Department has decided that [the salary basis test] should be retained."). *See also* 3 EMPLOY. COORDINATOR COMP. § 3:26 ("Note that a highly compensated employee must still meet the requirements of the salary basis test, being paid at least $684 on a salary basis, to be exempt from the overtime requirements. Thus, an employee earning over $100,000 will not necessarily be a highly compensated employee if the employee's compensation is paid on an hourly basis.").

Moreover, amici's purposivist argument is not just anti-textual—it also fails on its own terms. Amici suggest that Hewitt is well paid, so he has no right to complain about his hours. But it should surprise no one that many people value more free time over more money. And honoring that preference has always been at the heart of the FLSA. As we noted at the outset, courts have historically understood overtime pay not so much as a benefit to

No. 19-20023

employees (although it obviously is), but as a "penalty" to employers—a penalty specifically designed to make it more expensive for an employer to hire one worker to work 80 hours than two workers to work 40 hours. *See, e.g., Overnight Motor Transp.*, 316 U.S. at 577; *Mechmet*, 825 F.2d at 1176. The overtime penalty helps "reduce unemployment" by encouraging employers to add more workers rather than more hours. *Id.* So amici's approach is not just contrary to text—it also undermines a core purpose of the FLSA.

Second, amici complain that faithful application of the regulatory text will wreak havoc on the oil and gas industry.

But of course, the salary basis test applies across countless industries, not just oil and gas—and if the oil and gas industry doesn't like it, it can seek an industry exemption, just as other industries have done. *See, e.g.*, 29 C.F.R. § 541.709 (exempting certain motion-picture employees from complying with the salary basis test).

Perhaps one reason why no oil and gas exemption exists to date is because it is unclear why that particular industry would be uniquely harmed by the ordinary application of the Secretary's salary basis test. After all, there would appear to be any number of ways that companies like Helix could avoid paying overtime under the FLSA. They could pay Hewitt a comparable weekly or monthly salary, rather than a daily rate. Or they could pay him a fee for each hitch—or comply with the "fee basis" test in some other way. *See id.* §§ 541.601(b)(1), .605. (Alternatively, they could hire more tool pushers, so that none of them has to work more than forty hours. Admittedly, that would increase costs to the company. But that would also serve a core objective of the FLSA, namely, to increase employment. If the industry does not like that result, its complaint lies not with Hewitt—or this court—but with Congress.)

No. 19-20023

Barring all of that, the industry can lobby Congress or the Secretary of Labor to amend the salary basis test—either on behalf of all employers, or for just those in the oil and gas business. But what the industry cannot do to ask judges to "alter the text [of the regulations] in order to satisfy . . . policy preferences." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002). "These are battles that should be fought among the political branches and the industry. Those parties should not seek to amend the [regulations] by appeal to the Judicial Branch." *Id.*

* * *

If we were limited to the statutes enacted by Congress, we might very well have ruled for Helix in this matter. But we are also bound by regulations issued by the Secretary of Labor. And those regulations exempt daily rate employees from overtime—but only "if" that employee's compensation meets certain conditions. Helix asks us to ignore those conditions. But we are not at liberty to do so. And certainly not on the ground that the oil and gas industry warrants special treatment not supported by the text, or because Hewitt already makes enough money and thus doesn't deserve FLSA protection. Our duty is to follow the law, not to vindicate anyone's policy preferences. Our ruling today construes the salary basis for everyone—not just the oil and gas industry. Likewise, the salary basis test applies not only to highly compensated employees like Hewitt, but also to all other executive, administrative, and professional employees—including those who earn less than a fifth of what Hewitt makes.

14

No. 19-20023

We reverse the grant of summary judgment to Helix and remand for further proceedings consistent with this opinion.[3]

---

[3] On remand, Helix may be able to demonstrate that it paid Hewitt on a "fee basis" under 29 C.F.R. § 541.605, or that it complied with another regulatory exemption from the overtime requirements. The parties can resolve those issues, along with any other factual disputes, on remand.

Hewitt also asks for liquidated damages. *See* 29 U.S.C. § 216(b). But the district court decided this case on summary judgment. Issues relating to liability, including whether liquidated damages are appropriate, *see, e.g., Lowe v. Southmark Corp.*, 998 F.2d 335, 337 (5th Cir. 1993), are best left to the district court in the first instance.

No. 19-20023

JAMES C. HO, *Circuit Judge*, concurring:

The dissent begins by expressing "due respect" to the majority—and then ends with a well-known literary quote about idiots. *Post*, at 24, 37 & n.39. It concludes that my opinion in this case is worth "nothing." *Id.* at 37.

To some, statements like these may be reminiscent of the wisdom of Ricky Bobby. *See* TALLADEGA NIGHTS: THE BALLAD OF RICKY BOBBY (2006) ("What? I said 'with all due respect!'"). To others, it may call to mind a recent observation by one of our respected colleagues: "More often than not, any writing's persuasive value is inversely proportional to its use of hyperbole and invective." *Keohane v. Fla. Dep't of Corrs. Sec'y*, __ F.3d __, __ (11th Cir. 2020) (Newsom, J., concurring in the denial of rehearing en banc).

As the adage goes, the loudest voice in the room is usually the weakest.

\* \* \*

"Reasonable jurists can apply traditional tools of construction and arrive at different interpretations of legal texts." *Gamble v. United States*, 139 S. Ct. 1960, 1986 (2019) (Thomas, J., concurring). For example, in *JCB, Inc. v. Horsburgh & Scott Co.*, 912 F.3d 238 (5th Cir. 2018), I observed that "Judge Duncan and I emphatically agree that the proper function of the judiciary is to construe statutory texts faithfully . . . . We nevertheless reach different conclusions as to the particular text before us, as textualists sometimes do." *Id.* at 242 (Ho, J., concurring). Some laws are "capable of competing plausible interpretations among reasonable jurists of good faith." *Id.*

But with "due respect," if there is a reasonable textual basis for refusing to apply 29 C.F.R. § 541.604(b) in cases governed by § 541.601 involving highly compensated employees, I cannot find one in the dissent.

16

No. 19-20023

1.    The dissent's entire textual basis for refusing to apply § 541.604(b) in cases involving § 541.601 amounts to this: § 541.601 does not mention § 541.604. To quote the dissent:  "§ 541.601 is devoid of any reference to § 541.604(b).  It instead mentions only § 541.602." *Post*, at 26. *See also id.* at 34 (same).

But if the dissent is right that we shouldn't apply § 541.604(b) to any provision that does not explicitly mention it, then we should also refuse to apply § 541.604(b) to *any* executive, administrative, or professional employee—regardless of how much or little he is compensated.  After all, the regulations governing executive, administrative, and professional employees are all indistinguishable from § 541.601:  All of them cite § 541.602—and none of them cite § 541.604(b).  *See* 29 C.F.R. §§ 541.100, .200, .300. Indeed, under the dissent's reading, we would *never* apply § 541.604(b)— because §§ 541.602 and 541.604(b) do not expressly cross-reference each other.  The dissent's theory would thus render § 541.604(b) a dead letter— contrary to the canon against surplusage.

I suggest that the following is a better reading of the text:  None of these provisions needs to cite § 541.604(b), because § 541.604(b) itself makes clear that it is modifying the "salary basis" test of § 541.602.  *See id.* § 541.604(b) (laying out the circumstances in which an "exempt employee's earnings may be computed on an hourly, daily, or a shift basis[] *without . . . violating the salary basis requirement*") (emphasis added).

Besides which, there is nothing remarkable about reading one legal provision in light of another—even in the absence of an express cross-reference.  *See, e.g., Lockhart v. United States*, 546 U.S. 142, 148 (2005) (Scalia, J., concurring) (collecting cases holding that "Congress . . . may [enact] exempt[ions] . . . by 'fair implication'—that is, *without an express statement*") (emphasis added) (citing, *e.g., Warden v. Marrero*, 417 U.S. 653,

17

659-660 n.10 (1974); *Marcello v. Bonds*, 349 U.S. 302, 310 (1955); *Hertz v. Woodman*, 218 U.S. 205, 218 (1910); *Great N. Ry. Co. v. United States*, 208 U.S. 452, 465 (1908)). Indeed, it is a bedrock principle of statutory interpretation that "text[s] must be construed as a whole." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012). *See also id.* ("Perhaps no interpretive fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.").

Under the dissent's brand of textualism, by contrast, courts may read a provision out of the law altogether, on the ground that no other provision of law expressly cites it. That is a peculiar approach to textualism. It is no wonder that the dissent does not cite a single court that has ever embraced its cross-referencing theory of interpretation.

2. The dissent offers a second justification for its interpretation. It suggests that applying § 541.604(b) here would somehow render § 541.601 "superfluous." *Post*, at 28 (quoting *Anani v. CVS RX Services, Inc.*, 730 F.3d 146, 149 (2nd Cir. 2013)).

But that can't be right. The dissent forgets that § 541.604(b) only applies to those whose pay is "computed on an hourly, a daily or a shift basis." 29 C.F.R. § 541.604(b). It doesn't apply to weekly, monthly, and annually salaried workers at all. So how can applying § 541.604(b) to daily rate workers render § 541.601 surplusage—when § 541.604(b) would have no effect on highly compensated weekly, monthly, and annually salaried workers governed by § 541.601? The answer is that it can't.

So what gives? I can't help but wonder if the dissent's surplusage argument is premised on a basic misunderstanding of § 541.601. Perhaps the

dissent believes that the Secretary of Labor promulgated § 541.601 so that the highly compensated don't have to comply with salary basis requirements like § 541.604(b). Because if that's the premise, then applying § 541.604(b) to cases involving § 541.601 might very well render the latter provision surplusage.

But if that's the dissent's premise, it's demonstrably wrong. As the majority notes, *ante*, at 8, § 541.601 still requires the highly compensated to be "paid on a salary . . . basis." 29 C.F.R. § 541.601(b)(1). So the Secretary did not promulgate § 541.601 to alter the salary basis requirement for the highly compensated—rather, the Secretary promulgated § 541.601 to alter the "executive, administrative, or professional" duties requirement for the highly compensated. Indeed, § 541.601 expressly tells us so in subsection (c): "A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis *of the employee's job duties.*" *Id.* § 541.601(c) (emphasis added).

So it's not surprising that the Eighth Circuit sides with our majority here, and not the dissent. *See, e.g., Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1042 n.2 (8th Cir. 2020) ("[the] 'highly compensated employee exemption[]' . . . is a less burdensome way to prove an executive, administrative, or professional exemption") (citing 29 C.F.R. § 541.601(c)).

It's likewise unsurprising that the Sixth Circuit sides with our majority over the dissent. The dissent's sole authority for its surplusage theory is *Anani*. But *Anani* involved a weekly, not daily, rate employee—as both the Sixth Circuit and the majority here have pointed out, and the dissent itself concedes. *See Hughes v. Gulf Interstate Field Servs. Inc.*, 878 F.3d 183, 189–90 (6th Cir. 2017) ("*Anani* . . . involved [a] plaintiff[] who . . . [was] undisputedly guaranteed [a] weekly base salar[y] above the qualifying level."); *ante*, at 11 (same); *post*, at 28 (*Anani* involves an "employee with a guaranteed weekly

No. 19-20023

amount"). This case, by contrast, involves a daily rate employee—as the dissent admits. *See post*, at 30 (noting "Hewitt's [] daily rate").

3.     The dissent acknowledges that its approach has been rejected by the Sixth and Eighth Circuits. It simply accuses the Sixth Circuit of following "false premise[s]," and dismisses the Eighth Circuit as "misguided." *Id.* at 32.

The dissent likewise admits that its approach has been rejected by the Labor Department. It concedes that a recent opinion letter issued by the Department "directly address[es] the question presented in this case." *Id.* at 32–33. The dissent nevertheless minimizes its importance, claiming that the letter was simply following our circuit's prior opinion in this case. To quote the dissent, "[t]he DOL opinion letter did not 'call the play'—it is merely cheerleading after the fact." *Id.* at 33.

It is unclear to me how the dissent thinks this metaphor serves its cause. I would have thought that the whole point of being a "cheerleader" is to take sides in a competition between opposing sides. And that is precisely what the Labor Department did here: If there is a circuit split as the dissent claims, then the Department took sides in that split by siding with us, as well as with the Sixth and Eighth Circuits—and not with the dissent.

4.     The dissent accuses the majority of engaging in purposivism. *Id.* at 34–35. But this is projection. For it is the dissent that seems to embrace purposivism. The majority disavows it—discussing legislative intent and purpose only to explain how amici's purposivist arguments (echoed by the dissent) fail on their own terms. *Ante*, at 11–14.

a.     For example, the dissent begins its analysis by appealing to "common sense." *Post*, at 25. But as the majority responds, it is common sense that many people prefer more free time over more money. *Ante*, at 12. It is common sense that workers like Hewitt might not want to work a 16-

20

No. 19-20023

hour day (or an 80-hour week), for the exact same pay that they would have earned working far fewer hours over the same number of days. It is common sense that free time is valuable to workers at every level of compensation—and not just to lesser paid employees. And so it is unsurprising that these principles would be reflected in FLSA regulations.

b.    The dissent insists that "[i]t would be redundant and a waste of resources" to force the oil and gas industry to hire more tool pushers. *Post*, at 35. Yet the dissent admits that "the FLSA was enacted to encourage employers to hire more employees." *Id.*

Besides which, what's so hard about a daily rate worker complying with § 541.604(b) anyway? All you have to do is meet the minimum weekly guarantee and reasonable relationship requirements. Heck, the regulation even provides a helpful example of how to do this: "[A]n exempt employee guaranteed compensation of at least $725 for any week in which the employee performs any work, and who normally works four or five shifts each week, may be paid $210 per shift without violating the $684-per-week salary basis requirement." 29 C.F.R. § 541.604(b).

So all it takes here is just one simple adjustment. Helix paid Hewitt $963 per day. So imagine that Helix also assured Hewitt that he would never earn less than, say, $4,000 per week—even during those weeks in which he worked four days or less. That simple adjustment would be enough to satisfy the salary basis test by satisfying both prongs of § 541.604(b): Hewitt would be paid a minimum weekly guarantee of $4,000, regardless of the number of hours, days, or shifts worked. And that guaranteed weekly pay would be reasonably related to the amount actually earned—consistent with the example provided in § 541.604(b) itself.

In sum, it is not at all clear why our holding would necessarily require the industry to hire more tool pushers or otherwise endure significantly

21

No. 19-20023

higher expenses. *See also ante*, at 13 (noting other potential measures that the industry could adopt).

c. Perhaps strangest of all, the dissent quotes a snippet of legislative history from 1997 to support its contention that overtime pay just shouldn't apply to high earners. *Post*, at 34 & nn.35–36. The dissent neglects to mention that the sentiment it imputes to "Congress" is nothing more than a floor statement by a lone House member, in support of a proposed FLSA amendment that never got so much as a vote.

This is not even good purposivism, let alone good textualism.

\* \* \*

The dissent used to side with the majority on these issues. *See Hewitt v. Helix Energy Sols. Grp.*, 956 F.3d 341 (5th Cir. 2020)). It once agreed that "an employer may compute an employee's earnings on an hourly, a daily or a shift basis, . . . so long as the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis." *Id.* at 344 n.4 (cleaned up) (citing 29 C.F.R. § 541.604(b)).

But now the dissent calls for rehearing en banc. So what's changed?

Certainly none of the relevant legal texts have changed. To the contrary, our view has since been *reinforced* by the Labor Department, as well as by a(nother) unanimous circuit decision (the Eighth Circuit in *Coates*).

The only change I'm aware of is that an armada of oil industry amici now urges us to take this case en banc. According to one amicus, applying § 541.604(b) here would "threaten[] the country's hydrocarbon industry." According to other amici, applying § 541.604(b) will "negatively impact[] a vital industry." The dissent openly echoes amici's themes—speaking on behalf of "[t]hose of us who were born, bred, and educated in the 'oil patch.'" *Post*, at 24. *See also, e.g., id.* at 26 (applying § 541.604(b) "will have

No. 19-20023

lasting, negative repercussions . . . on the petroleum industry"); *id.* at 36 (applying § 541.604(b) "will likely have devastating effects . . . in the oil and gas arena"); *id.* (quoting amici).

But with "due respect" to "[t]hose of us who were born, bred, and educated in the 'oil patch,'" *id.* at 24: Those of us who were born, bred, and educated in textualism are unfamiliar with the "bad for business" theory of statutory interpretation offered by the dissent under the purported flag of textualism.

No one of course doubts the importance of the energy industry to the health and prosperity of our nation. But these are policy arguments that should be presented to Congress and the Secretary, not the judiciary. "These are battles that should be fought among the political branches and the industry" — "not . . . by appeal to the Judicial Branch." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002). *See also ante*, at 14 (same).

I remain, as always, willing — indeed, duty bound — to go wherever the text leads. For it is the text enacted by the political branches that leads — and the judiciary that follows. If our panel has erred, I will be the first to admit it. But nothing in the dissent persuades me that anything in the text directs us to ignore § 541.604(b), or to reject the opinions of the Sixth and Eighth Circuits and the Labor Department. To the contrary, this case seems by every indication to fall well within the plain terms of § 541.604(b). Indeed, why did the Secretary bother to promulgate this provision, if not to govern daily rate cases just like this? The dissent offers no good reason. And I cannot conceive of one myself. Accordingly, I concur.

23

No. 19-20023

JACQUES L. WIENER, JR., *Circuit Judge*, dissenting:

With due respect for my esteemed colleagues in the majority, who in good faith attempt to apply the regulatory text as written, I am compelled to dissent.

Those of us who were born, bred, and educated in the "oil patch," and who practiced mineral law for decades, are quite familiar with the levels of personnel who work the various on-shore and off-shore oil rigs and platforms. First come the geologists and petroleum engineers who make trips to oil and gas rigs, but who spend most of their time in offices analyzing and advising owners and promoters. They are analogous to colonels or even generals in the military. Next, among those who spend all of their worktime on oil rigs and platforms, the superintendent ranks highest—the equivalent of captains or even majors. Then come the so-called tool pushers (who never "push" a "tool"), the equivalent of first or second lieutenants. Tool pushers oversee and maintain direct contact with the common laborers on the oil and gas rigs—universally called "roughnecks," the equivalent of privates or PFCs.

* * *

Plaintiff-Appellant Michael Hewitt worked for Defendant-Appellee Helix Energy Solutions Group, Inc. ("Helix") as a tool pusher, supervising approximately twelve to fourteen roughnecks at any given time. The parties agree that Hewitt made $963 per day for every day that he worked, regardless of the number of hours per day he worked.[4] His salary totaled more than

---

[4] Hewitt's pay fluctuated from as low as $871.65 per day to as high as $1,912.32 per day. His daily rate, however, was predetermined by an employment agreement. So his daily rate was always "predetermined." *See* 29 C.F.R. § 541.602(a). At oral argument the parties referred to his salary as $963 per day, regardless of the number of

24

No. 19-20023

$200,000 per year. Common sense dictates that he was a "highly compensated employee,"[5] and a very high one indeed. In fact, Hewitt made more than twice as much as the threshold amount of $100,000 required to be a highly compensated employee at the time of the then-applicable regulation.[6] So why, you ask, would such a highly compensated employee be entitled to overtime? The answer is clear to the panel majority: because (1) he was not entitled to a guaranteed weekly rate, and (2) there was no "reasonable relationship" between his take-home pay and his daily rate. To me, this conclusion ignores common sense.

To determine whether Hewitt was a highly compensated employee and thus not entitled to overtime under the Fair Labor Standards Act ("FLSA"), however, we cannot rely on mere common sense; we must look to the text of the regulation governing this type of employee. The highly compensated employee exemption states that "an employee with total annual compensation of at least $107,432 is deemed exempt . . . if the employee customarily and regularly performs any one or more of the exempt

---

hours per day he worked. In any event, his salary was indisputably more than $455 per day—the minimum amount that must be earned by highly compensated employees under the relevant regulation at the time the incident arose. *See id.* § 541.601(b)(1) (2014).

[5] *See id.* § 541.601(a)(1) (2020).

[6] *See id.* § 541.601(b)(1) (2014). The 2014 version of the regulation was the version in place at the time of Hewitt's employment. On June 8, 2020, however, the total annual compensation was changed to at least $107,432, including at least $684 per week. *See id.* § 541.601 (2020). Hewitt's daily rate of $963 and annual compensation of $200,000 satisfy either version of the regulation. Throughout the rest of this dissent, I refer to and use the numbers from the 2020 version of the regulation.

No. 19-20023

duties or responsibilities of an executive, administrative or professional employee."[7]

The parties agree that Hewitt met all of these conditions. So why does the panel majority require more? It is clear to me as a textualist that if one looks at § 541.601, there is no requirement that an employee meet § 541.604(b)'s reasonable relationship test. In fact, § 541.601 is devoid of *any reference* to § 541.604(b); it states only that the "'[t]otal annual compensation' must include at least $684 per week paid on a salary . . . basis *as set forth in []§ 541.602*."[8] (Note that there is no requirement that the employee's pay satisfy § 541.604(b).) The panel majority chooses to look beyond the text of the regulation at issue and look to an inapplicable regulation, *viz.*, § 541.604(b).

This was not the law prior to the panel majority's opinion. And I fear that the result of the panel majority's opinion will have lasting, negative repercussions, not just on the petroleum industry, but on all industries in this region and in any region that finds the panel majority's opinion persuasive. Moreover, it creates an unnecessary circuit split,[9] while purporting not to do so, by bringing in cases that are inapplicable to the case at hand.[10]

---

[7] *Id.* § 541.601(a)(1).

[8] *Id.* § 541.601(b)(1) (emphasis added).

[9] *See Anani v. CVS RX Servs., Inc.*, 730 F.3d 146, 149 (2d Cir. 2013) ("We perceive no cogent reason why the requirements of C.F.R. § 541.604 must be met by an employee meeting the requirements of C.F.R. § 541.601."); *Litz v. Saint Consulting Grp., Inc.*, 772 F.3d 1, 2 (1st Cir. 2014) (holding that the reasonable relationship test does not apply to highly compensated employees and citing *Anani*).

[10] The panel majority says *Coates v. Dassault Falcon Jet Corp.* and *Hughes v. Gulf Interstate Field Services, Inc.* are applicable to this case and that "[t]here is no split" between these cases, Hewitt's case, and *Anani* and *Litz*. This is wrong, as explained

No. 19-20023

I begin, as does the panel majority, by applying the unambiguous language of the regulation at issue: the highly compensated employee exemption. Section 541.601 states that "an employee with total annual compensation of at least $107,432 is deemed exempt[.]"[11] There is one, and only one, condition: The "[t]otal annual compensation must include at least $684 per week paid on a salary . . . basis as set forth in []§541.602."[12] Importantly, the Secretary points us to § 541.602 (the salary basis test), not to § 541.604(b) (the reasonable relationship test).

By requiring employees meeting the requirements of § 541.601 to also meet the requirements of § 541.604(b), the panel majority creates tension where there need not be any. And why is there no tension between § 541.604(b) and § 541.602? Because these provisions apply to different groups of employees. To quote *Anani*:

---

below. Moreover, in *Hughes*, the employees' daily rate was below the regulatory minimum, so § 541.604(b) was clearly applicable. *See* 878 F.3d 183, 185–86 (2017) (noting that the employees received a letter stating that they were entitled to a daily rate of $337 per day in addition to their weekly per diem and computer stipend). The *Hughes* court also applied the reasonable relationship test because the employees' salary was not computed on a "weekly, or less frequent basis." *Id.* at 189. Hewitt's salary, however, *was* computed on a "weekly, or less frequent basis," *see* 29 C.F.R. § 541.602(a), because, although his salary was based on a daily rate, it was computed and paid based on the total number of days he worked each week. In *Coates*, the employees were paid $285.56 per day bi-weekly ($74,244.96 divided by 52 weeks per year divided by 5 days per week). *See* 961 F.3d 1039, 1044 n.5 (8th Cir. 2020). So for the same reason as the *Hughes* court, the *Coates* court was required to apply the reasonable relationship test. In short, there is no circuit split between *Hughes*, *Coates*, *Anani*, and *Litz*, but the panel majority creates a split by applying the reasonable relationship test to Hewitt's salary, which was more than the regulatory minimum.

[11] 29 C.F.R. § 541.601(a)(1).

[12] *Id.* § 541.601(b)(1).

No. 19-20023

We perceive no cogent reason why the requirements of C.F.R. § 541.604 must be met by an employee meeting the requirements of C.F.R. § 541.601. Indeed, C.F.R. § 541.601 is rendered essentially meaningless if a "highly compensated employee" must also qualify for the exemption under C.F.R. § 541.604 or, to state the converse, would lose the "highly compensated employee" exemption by failing to qualify under C.F.R. § 541.604. To be sure, C.F.R. § 541.604 deals with employees who earn the "[m]inimum [g]uarantee plus extras," but every employee with a guaranteed weekly amount exceeding $455 who earns over $100,000, and is therefore purportedly exempted by C.F.R. § 541.601, also fits the description of having a "minimum guarantee plus extras." Appellant's interpretation thus renders C.F.R. § 541.601 superfluous. The reading that gives full meaning to both C.F.R. § 541.601 and C.F.R. § 541.604 is that each deals with different groups of employees who receive a "minimum guarantee plus extras." The first exemption deals with those employees who earn over $100,000 annually while the second exemption deals with employees whose guarantee with extras totals less than $100,000 annually.[13]

Continuing to follow the text, then, we look to § 541.602 only—the "condition" of a highly compensated employee. That "salary basis test" requires that:

the employee [1] regularly receives each pay period [2] on a weekly, or less frequent basis, [3] a predetermined amount [4] constituting all or part of the employee's compensation, [5] which amount is not subject to reduction because of variations in the quality or quantity of the work performed.[14]

---

[13] 730 F.3d at 149 (alterations in original).

[14] 29 C.F.R. § 541.602(a).

28

No. 19-20023

Hewitt's bi-weekly pay clearly and indisputably satisfied the salary basis test. He received his paycheck every two weeks. He thus "regularly receive[d] each pay period on a weekly, *or less frequent basis*."[15] Hewitt's pay—$963 per day—was *predetermined*: Prior to performing any work, he knew the amount he would be paid for each day, regardless of how few or how many hours he worked. His daily rate did not constitute all of his compensation, but the salary basis test only requires that the predetermined amount—here, $963 per day for each day on which he worked—constitute "all *or part*" of Hewitt's compensation. It is thus possible, as in Hewitt's case, that a daily rate employee, who has only a partially predetermined total compensation, could satisfy the salary basis test.

Furthermore, Hewitt's salary, or his base pay, was not subject to reduction "because of variations in the quality or quantity of the work performed."[16] Hewitt could have been less productive than Helix desired, but he would still be paid his daily rate for any day during which he performed *any* work. And he could have significant variations in the quantity of days and hours he worked, but his guaranteed daily minimum of $963 would not vary.

A final requirement of the salary basis test is that "an exempt employee must receive the full salary for any week *in which the employee*

---

[15] *Id.* (emphasis added). *But see Hughes*, 878 F.3d at 189 (holding that a daily rate is not received "on a weekly, or less frequent basis" because a daily rate is "calculated *more* frequently than weekly"). *Hughes* seems to be an outlier in holding that a daily rate is calculated more frequently than weekly. *See, e.g., Coates*, 961 F.3d at 1046 (explaining that a human resources employee "gave an accurate general description of [the defendant's] hourly-based payroll records, a system which, as we have explained, is not inconsistent with the Secretary's salary-basis regulations," which require that the employee be paid on a weekly, or less frequent basis).

[16] 29 C.F.R. § 541.602(a).

29

No. 19-20023

*performs any work* without regard to the number of days or hours worked."[17]
The panel majority concludes that Hewitt was paid *with* regard to the number
of days worked. This is a flawed reading of the regulation. If Hewitt
performed any work—even for just one hour—he was paid his full daily rate.
He was thus paid at least $963 for each and every week he worked—even if
he worked only one hour—*without* regard to the number of days or hours
worked. He clearly met the requirements of 29 C.F.R. § 541.602(a).

The First and Second Circuits have similarly concluded that an
employee who is guaranteed an amount each week that exceeds the $455
weekly threshold is paid on a salary basis. In *Litz*, the employees earned
between $40 and $60 for every hour billed but were guaranteed a weekly
"stipend" of $1,000, regardless of hours worked.[18] The First Circuit
concluded that the employee was paid on a salary basis because the $1,000
weekly guarantee was both (1) "predetermined" and (2) "not subject to
reduction because of variations in the quality or quantity of the work
performed."[19] The Second Circuit in *Anani* concluded that a pharmacist who
received a guaranteed $1,250 weekly salary and significant additional
compensation based on number of hours worked was paid on a salary basis.[20]
Similarly, Hewitt's $963 daily rate was a guarantee if he performed any work
at all. His rate was predetermined and not subject to reduction absent
operational changes.

---

[17] *Id.* § 541.602(a)(1) (emphasis added).

[18] 772 F.3d at 2.

[19] *Id.* at 5 (quoting 29 C.F.R. § 541.602(a)).

[20] 730 F.3d at 147–48.

30

No. 19-20023

The panel majority distinguishes *Litz* and *Anani* by focusing on the weekly guarantee in those cases. But the panel majority misses the forest for the trees. The weekly "stipend" in *Litz* and the "weekly guarantee" in *Anani* are analogous to Hewitt's $963 daily rate, which was also guaranteed if he performed any work at all. The regulations require only that the employee be paid on a "weekly, or less frequent basis."[21] And Hewitt was paid his daily rate every week in which he performed any work at all. The fact that the "stipend" in *Litz* and the "weekly guarantee" in *Anani* were guaranteed makes no difference. These opinions focused less on the guarantee and more on the fact that the sum was paid on a weekly (or bi-weekly) basis. And Hewitt's $963 daily rate was guaranteed as well if he performed any work at all. Furthermore, the regulation requires only that the guarantee not be subject to reduction because of the variations in the quality or quantity of work performed.[22] So too here. Hewitt's guaranteed $963 was not subject to reduction based on the quantity or quality of the work he performed. Finally, the *Litz* and *Anani* courts *did not* rely on § 541.604(b) in requiring a weekly guarantee; they simply relied on § 541.602, which requires no weekly guarantee.[23] The weekly guarantee is thus immaterial. But even if it was material, Hewitt also had a weekly guarantee if he performed any work at all, as explained above.

The panel majority relies heavily on *Hughes* and *Coates* for the principle that a court must apply § 541.604(b)—specifically a weekly guarantee—to daily rate employees. It states that *Coates* was decided after

---

[21] 29 C.F.R. § 541.602(a)

[22] *See id.*

[23] *See Litz*, 772 F.3d at 5; *Anani*, 730 F.3d at 147–48.

No. 19-20023

*Hughes* and thus it is entitled to more authority than *Litz* and *Anani*. I disagree.

For one thing, the *Hughes* court misinterpreted § 541.602(a) because it held that a daily rate pay cannot be paid on a weekly or less frequent basis.[24] It therefore begins with a false premise because a daily rate *can* be paid on a weekly or less frequent basis. The *Coates* court was thus misguided when it relied on that opinion. Furthermore, the *Coates* court merely concluded that there was insufficient evidence before the district court to decide the case as a matter of law when there was evidence of reductions in salary.[25] The *Hughes* court reached a similar conclusion.[26] When looking to § 541.604(b), the *Coates* court focused only on the fact that a salary must be "guaranteed" at a minimum amount not subject to reduction.[27] It did not focus on the second clause of the reasonable relationship test, as the panel majority does in this case.

The panel majority makes much of an August 2020 opinion letter issued by the Department of Labor ("DOL"). After our now withdrawn opinion was entered, the Wage and Hour Division of the Department of Labor ("WHD") issued an opinion letter directly addressing the question

---

[24] 878 F.3d at 189.

[25] 961 F.3d at 1045–46.

[26] *See Hughes*, 878 F.3d at 189 (reversing grant of summary judgment in favor of employer because the record did not establish that "the employment arrangement also include[d] a guarantee of at least the minimum weekly required amount paid on a salary basis" (quoting 29 C.F.R. § 541.604(b))).

[27] 961 F.3d at 1048.

32

No. 19-20023

presented in this case.[28] The WHD concluded that a daily rate employee does not meet the salary basis test. This conclusion, however, was based on our subsequently-revoked opinion. The DOL opinion letter did not "call the play"—it is merely cheerleading after the fact.

Furthermore, because neither the panel majority nor I deem the regulation ambiguous, we need not provide *Chevron* deference to the opinion letter.[29] (In fact, it is questionable whether we even need to provide *Skidmore* deference to the opinion letter. Here, the 2020 opinion letter does not have the "power to persuade" because it is based on our now-revoked opinion; furthermore, the regulation at issue is not ambiguous.)[30]

A report issued by the DOL addressing this specific issue—the Weiss Report—is even more instructive,[31] and the DOL continues to rely on it.[32]

---

[28] *See* Opinion Letter FLSA2020-13, 2020 WL 5367070, at *3–4 (Aug. 31, 2020) (citing *Hewitt v. Helix Energy Sols. Grp.*, 956 F.3d 341 (5th Cir. 2020)).

[29] *See Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521, 525 (5th Cir. 1999) ("Opinion letters, which are issued without the formal notice and rulemaking procedures of the Administrative Procedure Act, do not receive the same kind of *Chevron* deference as do administrative regulations."); *accord Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000); *see also Belt v. EmCare, Inc.*, 444 F.3d 403, 408 (5th Cir. 2006) ("If the regulation is unambiguous, we may still consider agency interpretation, but only according to its persuasive power.").

[30] *Cf. Christensen*, 529 U.S. at 587 (granting *Skidmore* deference to an opinion letter based on its "power to persuade" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))).

[31] *See* Reports and Recommendations on Proposed Revisions of Regulations, Part 541, by Harry Weiss, Presiding Officer, Wage & Hour & Pub. Contracts Divs., U.S. Dep't of Labor (June 30, 1949) [hereinafter the "Weiss Report"].

[32] *See* Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122, 22124 (Apr.

No. 19-20023

The Weiss Report states that, for "an employee paid on a daily or shift basis" (as was Hewitt), the salary basis test will be met "if the employment arrangement includes a provision that he will receive not less than the amount specified in the regulations in any week in which he performs any work."[33] As stated above, Hewitt was a daily rate employee who would receive $963—more than twice the regulatory threshold amount—for any week in which he performed any work at all.

Finally, the panel majority looks to the regulatory purpose of the reasonable relationship test to justify its position that Hewitt was not paid on a salary basis. Again, I disagree. We must be wary of the dangers of looking to regulatory purpose when the text of the regulation clearly demands a different outcome. And here, the text of § 541.601 is devoid of any reference to § 541.604(b). It instead mentions only § 541.602.[34] Furthermore, purpose and policy *do* support Hewitt's salary satisfying the salary basis test. The panel majority's holding is in fact inconsistent with Congress's express intent under the FLSA. Congress has stated that "there is no reason that the FLSA, which was passed to protect laborers who 'toil in factory and on farm,' and who are 'helpless victims of their own bargaining weakness,' should ever be interpreted to protect workers making high five-figure or six-figure incomes."[35] Congress went on to say that "the courts need to refocus their efforts" away from protecting these highly paid workers.[36]

---

23, 2004) ("The Department notes, however, that much of the reasoning of the Stein, Weiss and Kantor reports remains as relevant as ever.").

[33] Weiss Report at 26.

[34] *See* 29 C.F.R. § 541.601(b)(1).

[35] 143 Cong. Rec. E317-04, E317-18, 1997 WL 79643, at *2 (Feb. 26, 1997).

[36] *Id.*

No. 19-20023

Hewitt was a very highly paid worker, and I seriously doubt that Congress's purpose was to allow him overtime under the FLSA.

Finally, the panel majority states that § 541.604(b)

> sets a *ceiling* on how much the employee can expect to work in exchange for his normal paycheck, by preventing the employer from purporting to pay a stable weekly amount without regard to hours worked, while in reality routinely overworking the employee far in excess of the time the weekly guarantee contemplates.[37]

But here, Helix *did not* routinely overwork Hewitt without providing him adequate pay. In fact, it did just the opposite: Hewitt worked on a "hitch" that lasted about a month, and he made a staggering $200,000 or more per year.

The panel majority correctly states that the FLSA was enacted to encourage employers to hire more employees. It creates a "penalty" for not doing so, *viz.*, overtime wages. But that regulatory purpose falls flat on its face in the fact pattern before us. Hewitt was paid more than $200,000 per annum as a tool pusher. He would have been paid significantly more with overtime. So why not hire more tool pushers? The answer is clear: Tool pushers are employed as overseers, not as manual laborers. It would be redundant and a waste of resources to hire multiple overseers to perform the work of this particular position. Furthermore, if a company, such as Helix, had to employ multiple tool pushers at $200,000 per year, they could very likely go bankrupt. And then Hewitt would be out of work. Surely, this is not the purpose behind the FLSA. In fact, Congress has *confirmed* that this is so.[38]

---

[37] Majority Opinion ("*Ante*") at 7.

[38] *See supra* notes 32–33 and accompanying text.

35

No. 19-20023

In sum, the district court was correct in concluding that Hewitt's salary satisfied the highly compensated employee exemption because he was paid on a salary basis.

\* \* \*

I respectfully submit that this case should be reheard by our *en banc* court. If the panel majority's opinion is allowed to stand, it will likely have devastating effects on all employers, especially in the oil and gas arena, in our circuit. Employers like Helix will have to pay highly skilled supervisors like Hewitt considerable overtime wages. *Amici* estimate that Hewitt, who already makes more than $200,000 per year, would have overtime wages of at least $52,000 per year if the panel majority's holding stands. As *amici* aptly point out, "[a]ppending these types of costs to expensive hydrocarbon exploration in the Fifth Circuit will put the region, and the industry, at a significant disadvantage to other exploration operations elsewhere in the country and the world."

Consistent with two other circuits, I would not apply the reasonable relationship test to highly compensated employees. And there is no question in my mind that Hewitt was a highly compensated employee because he clearly was paid on a salary basis. Neither is it disputed that Hewitt met the other requirements to be considered a highly compensated employee. The district court held as much, and I would affirm the judgment of that court.

No. 19-20023

Finally, with utmost respect for my friend and colleague who authored the special concurrence, my only response is to quote Macbeth: "full of sound and fury, signifying nothing."[39]

For the foregoing reasons, I respectfully dissent.

---

[39] WILLIAM SHAKESPEARE, MACBETH act 5, sc. 5, lines 15–17. To be sure, the harshness of the full quotation is unwarranted, and, thus, I only quote what is appropriate.

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

December 23, 2020

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

    No. 19-20023   Hewitt v. Helix Engy Solutions Grp
                   USDC No. 4:17-CV-2545

Enclosed is the opinion entered in the case captioned above.

                    Sincerely,

                    LYLE W. CAYCE, Clerk

                    *Christina Rachal*

                    By: _____
                    Christina C. Rachal, Deputy Clerk
                    504-310-7651

Mr. David J. Bradley
Ms. Kimberly Frances Cheeseman
Mr. Michael Carter Crow
Mr. David B. Jordan
Mr. Robert Peter Lombardi
Ms. Katherine D. Mackillop
Ms. Jesika Jasmine Silva Blanco
Mr. Edwin Sullivan